## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JOHN DOE, M.D.,

     Plaintiff,

v                                          CASE NO.
                                            HON.

THE BOARD OF REGENTS OF THE
UNIVERSITY OF MICHIGAN, MARIE LOZON,
M.D., and JUSTIN DIMICK, M.D., Individually,

     Defendants.

_____/

| | |
|---|---|
| MIDWEST LEGAL PARTNERS, PLLC | CUMMINGS, McCLOREY, DAVIS |
| By: **SAIF R. KASMIKHA** (P74320) | & ACHO, P.L.C. |
| 42705 Grand River Avenue | By: **RONALD G. ACHO** (P23913) |
| Suite 201 | 17436 College Parkway |
| Novi, MI  48375 | Livonia, MI 48152 |
| (248) 344-4570 | (734) 261-2400 |
| Attorneys for Plaintiff | Attorneys for Plaintiff |
| skasmikha@midwestlegalpartners.com | racho@cmda-law.com |

_____/

## VERIFIED COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF AND DEMAND FOR TRIAL BY JURY

**NOW COMES** Plaintiff, DR. JOHN DOE, M.D., by and through his attorneys, MIDWEST LEGAL PARTNERS, PLLC, by SAIF R. KASMIKHA, and CUMMINGS, McCLOREY, DAVIS & ACHO, PLC by RONALD G. ACHO, and for his Verified Complaint against Defendants, states as follows:

1.     Plaintiff, DR. JOHN DOE, M.D., (hereinafter "Plaintiff" or "Dr. Doe"), at all times relevant, was a resident of the County of Oakland, State of Michigan.

2.     Plaintiff files this case anonymously because of the extremely sensitive nature of the case, as Plaintiff's stellar reputation is a critical component to ensuring the public's trust for him to operate on their children for complex procedures, and Defendants' threat to report his suspension to the National Practitioner Data Bank and the State of Michigan Board of Medicine would cause irreparable damage to his reputation and career. As a result, this suit will require disclosure of information "of the utmost intimacy", and therefore, Plaintiff is entitled to protect his identity in this public filing by not disclosing his name. *Doe v. Porter*, 370 F.3d 558, 569 (6th Cir. 2004), citing *Doe v. Stegall*, 653 F.2d 180, 185-186 (5th Cir., 1981). See also *Doe v. Community Medical Center*, 353 Mont. 378; 221 P.3d 651 (Mont. 2009).

3.     The University of Michigan is a public university organized and existing under the laws of the State of Michigan, and is located in the City of Ann Arbor, County of Washtenaw, State of Michigan.

4.     The University of Michigan Health System is a hospital and health system operated by the University of Michigan, in the city of Ann Arbor, County of Washtenaw, State of Michigan. (The University of Michigan and the University

of Michigan Health System are hereinafter collectively referred to as "Michigan Medicine").

5. Defendant, The Board of Regents of the University of Michigan, is a body corporate, with the right to be sued, vested with government of the University of Michigan. MCL § 390.3 and § 390.4.

6. Defendant The Board of Regents of the University of Michigan is located in the city of Ann Arbor, County of Washtenaw, State of Michigan.

7. Defendant, Marie Lozon, M.D., is employed by Defendant, The Board of Regents of the University of Michigan through Michigan Medicine, in the City of Ann Arbor, County of Washtenaw, State of Michigan.

8. Defendant, Justin Dimick, M.D., is employed by Defendant, The Board of Regents of the University of Michigan through Michigan Medicine and the Chair of the Department of Surgery, in the City of Ann Arbor, County of Washtenaw, State of Michigan.

9. The amount in controversy herein exceeds $75,000.00 exclusive of interest, costs and attorney fees.

10. Venue and jurisdiction are otherwise proper within this Court.

## COMMON ALLEGATIONS

11. Throughout his years in practice, Plaintiff has established himself as a world-renowned surgeon at the pinnacle of his field.

12.     Dr. Doe is a Tenured Professor of Surgery in the Section of Plastic & Reconstructive Surgery, holds an Endowed Chair in the Department of Surgery, and holds a joint appointment as a Professor of Neurosurgery at the University of Michigan Medical School.

13.     Dr. Doe has practiced for 33 years as a surgeon, with 28 years as a plastic surgeon, specializing in craniofacial surgery, craniofacial anomalies, cleft lip, cleft palate, and craniosystosis.

14.     Dr. Doe is the Director of the Craniofacial Anomalies Program at the University of Michigan Medical Center and the Chief of Pediatric Plastic Surgery at the C.S. Mott Children's Hospital.

15.     Dr. Doe is a past Chairman of the Plastic Surgery Research Council, past President of the American Society of Maxillofacial Surgery, past president of the American Society of Craniofacial Surgery, past President of the Michigan Academy of Plastic Surgery, and currently on the board of the American Association of Plastic Surgery.

16.     Dr. Doe has won numerous awards for his excellence in teaching, research, and clinical care; lectures worldwide as an invited speaker on the science and practice of craniofacial surgery; and has also authored many book chapters, and published a substantial number of articles in peer reviewed journals.

17.   Dr. Doe has been invited and paid to give Named Lectureships, Keynote speakerships, Expert Panels and Teaching Symposiums both nationally and internationally throughout the world.

  a. Major venues include, but are not limited to: **Sweden**, **Egypt**, **Switzerland**, **Greece**, **Romania**, **Mexico**, **France**, **South Africa**, **Germany**, Brown University. University of Pennsylvania, Chicago, Harvard (Boston Children's Hospital), Columbia University, Northwestern University, Cleveland Clinic, Yale University, and the University of Pittsburgh.

  b. The above named venues are just a sampling of over 47 extramural invited presentations and 31 visiting Professorships.

18.   Dr. Doe recently won a plastic surgery achievement award from the **American Association of Plastic Surgeons** (AAPS) and was **named the organizations visiting professor for 2019.**

  a. The AAPS is the oldest and most prestigious national plastic surgical organization in the country. They limit their membership to no more than the top 5-10% of all plastic surgeons by strict criteria of accomplishment in the field. Those plastic surgeons then named Dr. Doe as their visiting professor to represent their organization and pay for him to lecture and teach cutting edge plastic surgery concepts, all over the country, for that year to academic institutions, training programs and smaller groups of surgeons across the nation.

  b. Dr. Doe was also prestigiously named the American Society of Maxillofacial Surgeons (ASMS) visiting professor in 2009-2010 and that organization also paid for him to lecture and teach nationwide at multiple venues under their banner.

19.     Dr. Doe has personally mentored over **200** Undergraduate & Graduate Students, Residents, & Post-Doctoral Fellows in Plastic Surgery Research.

   a. By any standard, this is a large number of individuals for mentorship in this field.

   b. This places Dr. Doe among one of the highest of any plastic surgery professor in the country in terms of mentorship.

20.     He has won or secured **$10,175,000** in Grants as Principle Investigator, Co-investigator and mentor from the NIH, foundations, and research sponsors.

   a. Over Ten Million Dollars ($10,000,000.00) in funding was brought into the University of Michigan.

   b. This number is even higher when taking into account indirect dollars that the University of Michigan gets from receiving such grants.

   c. This puts Dr. Doe in the top 5% of all plastic surgeons in the country and perhaps the world with regard to the securing of grant funding for his institution.

21.     Dr. Doe is **the only Plastic Surgeon in the country/world** that is the principal investigator of a plastic surgery training grant from the National Institutes of Health to teach surgical trainees from all over the country on how to become surgical scientists.

   a. This includes a 10-year commitment for this highly competitive grant from the NIH, getting the first grant of 5 years with a renewal now for another 5 years.

    b.   No other plastic surgeon has such a grant in the country/world.

    c.   This brings prestige to Dr. Doe but also the institution.

22.    He has 2 U.S. patents.

    a.   The most recent also received a commitment for over $150,000 by winning a University of Michigan Department of Surgery Shark Tank competition to help develop and bring the patented technology to market.

    b.   Very few plastic surgeons have patents but the most recent patent was paid for by the University because of their confidence in his discovery and the potential to profit significantly if/when commercialized.

    c.   While the Department of Surgery is undermining Dr. Doe, it is also investing a significant sum of money to bring his clinically related discoveries to market.

    d.   The Office of Technology transfer is paying fees well in excess of $100,000 to patent Dr. Doe's discoveries.

23.    Dr. Doe won the **best published plastic surgery paper award of the year** in multiple years including 2004, 2011, two in 2013, and 2015 from multiple national plastic surgery organizations.

    a.   These awards are given out after committees of national organizations look at nominated papers in plastic surgery published in peer reviewed journals that year and are deemed the best paper for that year as voted on by his peers.

    b.   To win this five separate times is a real accomplishment and puts Dr. Doe at the upper echelon of plastic surgeons in the country/world for his contributions to the field.

24.     Dr. Doe, or residents on his behalf, have won **28 best presentations awards** from regional, national, and international meetings for Investigative Papers.

   a. Dr. Doe won a coveted Ivy award for the best presentation at the largest plastic surgery meeting the country.

   b. These very competitive awards, won repeatedly over 30 years, demonstrates the excellence, high regard, and esteem that his work has been judged to hold within the national and international plastic surgery community but also the enduring, life-long, consistency of those contributions over time.

25.     Dr. Doe has won the **Bristol-Myers Squibb National Academic Medicine Mentor for Minority Students** and the Michigan Institute for Clinical & Health Research (MICHR) Distinguished Clinical and Translational Research Mentor Award and won 2 separate Teaching Awards voted on and awarded by clinical residents.

26.     Dr. Doe has over **340** clinical and research **articles** published in peer reviewed scientific journals and  his scientific and clinical papers have been presented at over **525** local, regional, national and international medical/surgical meetings.

27.     Dr. Doe has served as President or leader of multiple national and regional plastic surgery organizations. This includes the **American Society of Maxillofacial Surgeons**, **The Plastic Surgery Research Council**, the **American Society of Craniofacial Surgery**, and **the Michigan Academy of Plastic**

**Surgeons**. He is also currently on the board of the American Association of Plastic Surgeons (AAPS) the oldest and most prestigious plastic surgery organization.

28.     Dr. Doe has authored and co-edited two (2) major plastic surgery texts, one of which is considered to be the **authoritative atlas/text in craniofacial surgery**.

     a. He has also authored or co-authored **21** chapters in plastic surgery textbooks.

     b. These texts and chapters attest to his standing in the field of plastic and craniofacial surgery as an expert and respected authority both nationally and throughout the world.

29.     His active participation in multiple departments underscores the multidisciplinary nature of his clinical and research activities.

30.     Recognizing this fact, Dr. Doe has also been used personally, including his likeness, for many promotional materials for the University of Michigan, including posters, signs, and ads. (*See Exhibit A: Promotional Materials,* provided under seal*).*

31.     From any objective standpoint, Dr. Doe has an unblemished clinical record.

32.     Over 25 years at the University of Michigan, any audits, reviews for insurance approval and billing purposes, and reviews by Risk Management/Office of Clinical Safety have raised no practice or documentation concerns, other than routine matters.

**33.**    He has no significant patient complaints about his care, including any by patients who may have experienced complications.

**34.**    His relationships with patients is, and has always been, excellent.

**35.**    All objective measures of performance, as a medical doctor, have similarly raised no concerns.

**36.**    The matter before the Court today arises because of his mistreatment by Defendant Michigan Medicine, despite his impressive educational, clinical, and research accomplishments, Dr. Doe is a man of integrity performing lifesaving and life changing procedures for children.

**37.**    These exemplary traits are recognized by others in the departments in which he serves, and his colleagues have sought him out for guidance, advocacy, and mentorship, particularly when seeking support in what has become a progressively more hostile work environment.

**38.**    On more than one occasion, Dr. Doe approached Michigan Medicine leadership to report concerning administrative practices, particularly related to transparency and accountability.

**39.**    Shortly after Dr. Doe raised his concerns, Michigan Medicine, all of a sudden, decided to bring up three recent non-event matters—none of which had a negative outcome or harmful consequence.

40.     Michigan Medicine used those three recent matters as a basis for suspending Dr. Doe's clinical privileges indefinitely, and advising they were going to report him to the State of Michigan Board of Medicine, and they were going to report him to the National Practitioner Data Bank (NPDB), which they did.

41.     Each of those matters were reviewed and investigated and shown as non-issues.

42.     But Michigan Medicine, through another department, the Office of Clinical Affairs (OCA), has decided to *reopen* these matters and conduct a peer-reviewed determination of Dr. Doe's future, along with the future of his patients.

43.     At the outset, administrative best practices and Michigan Medicine polices, including preservation of confidentiality, were violated.

44.     Dr. Doe was forced to complete a program that would address behavioral concerns and had to travel to Kansas to do so. Peers who participated in this program include physicians who have suffered from substance abuse problems and those who have engaged in violative behavior such as engaging in sexual encounters with patients. Dr. Doe has not done such things and has never been accused by any employer of doing so.

45.     Dr. Doe, for no good or explained reason, has been prohibited from practicing for over 9 months.

46.     Dr. Doe was informed by Marie Lozon, clearly and repeatedly, that this "investigation" and process will take more than 30 days.

47.     Dr. Doe was informed by Marie Lozon, in writing, clearly and repeatedly, that his suspension will be reported to the NPDB and the State of Michigan Board of Medicine because it will exceed that 30-day timeframe.

48.     In essence, Dr. Doe was informed that he will have these public blemishes on his record before the matter is even thoroughly investigated, let alone concluded. (***See Exhibit B: 3/27/2021 notice regarding rights to hearing,*** provided under seal.)

49.     Dr. Doe was given 30 days to formally request a Fair Hearing, an internal process within Michigan Medicine's guidelines—he promptly exercised that right and made that request.

50.     Based on information, belief, current and past experience with Michigan Medicine, it is possible that Dr. Doe could be suspended from practice for at least another two years!

51.     Based on information, belief, current and past experience with Michigan Medicine, it is possible that Dr. Doe will not have a Fair Hearing for at least another year and a half!

52.     He has therefore been compelled to retain counsel at his own expense.

**53.** This action, if allowed to occur, will result in permanent and irreparable harm to Dr. Doe and his sterling reputation.

**54.** This report further harms his impeccable reputation in the medical community, both nationally and internationally.

**55.** Dr. Doe has not had the benefit of due process, and the findings of the OCA investigation have not been subject to validation or appropriate scrutiny.

**56.** Even if anyone could believe the findings have any merit, there is no basis whatsoever for the refusal in terms of medical competency or ability to practice in his field.

**57.** Dr. Doe's medical competency or ability has not only been unquestioned, but praised throughout his career at Michigan Medicine.  That is why the current actions of Michigan Medicine are so reprehensible.

**58.** The three de minimis matters raised involve a tiny fraction of Dr. Doe's extensive craniofacial and plastic surgery practice and his illustrious multi-decade career, and are without merit.

**59.** Finally, a fair hearing still has not been conducted, will likely not be conducted for at least another year and a half, and the serious flaws of the process so far have been clearly and extensively documented in earlier correspondence to Michigan Medicine.

**60.** The actions of the Defendants are not only retaliatory, but part and parcel of a pattern of conspiracy against his return to practice at Defendant, Michigan Medicine.

**61.** Dr. Doe has raised legitimate concerns regarding administrative practices to the Department of Surgery and the Office of Clinical Affairs.

**62.** The actions of the Defendants have already and will do additional and irreparable harm to Dr. Doe, his patients, his colleagues, and the clinical programs that he directs.

**63.** Due to the abrupt manner in which his clinical privileges were revoked, numerous patients had critical surgeries delayed or canceled.

### *Irreparable Harm to Michigan Medicine Programs and Patients*

**64.** Dr. Doe has spent nearly 30 years building his reputation in plastic and reconstructive surgery, including craniofacial anomalies, cleft palate, cleft lip, craniosystosis, and other pediatric plastic surgery innovations at Michigan Medicine.

**65.** The actions of the Defendants have caused significant and potentially irreparable harm to these programs.

**66.** The negative experience for the patients who had entrusted Michigan Medicine with their care has badly injured the previously strong relationship of these Michigan Medicine programs and referring physicians.

14

67.     This has been expressed emphatically by patients and schedulers. Switching physicians, abrupt rescheduling and cancellations, and other adjustments, have reduced the confidence of parents already faced with the very difficult and unenviable position of surgery on the face or skulls of their young children.

***Irreparable Harm to Dr. Doe Himself- Reputational and Social Harm***

68.     The damage to Dr. Doe's reputation are both very real and substantial and cannot be adequately compensated financially.

69.     His absence is noticed and duly noted.

70.     The actions of the Defendants have irreparably damaged the reputation of Dr. Doe without due process or even completion of the badly flawed investigative process.

71.     *A full reinstatement to practice until an investigation is concluded is the only equitable resolution at this time since patient safety is not at issue.*

72.     Until an investigation reveals otherwise after a conclusive finding, the suspension should be lifted and Defendants should be enjoined from providing any adverse reports to the State of Michigan Board of Medicine and NPDB.

***Professional Harm***

73.     Even a temporary loss of privileges does enormous and irreparable damage to Dr. Doe professionally, far beyond its financial effects.

15

**74.**     Hospital credentialing applications universally ask questions which Dr. Doe, to date, has been able to answer in the negative, but which will now require an affirmative response, even after he is cleared of any and all concerns. These standard questions include:

- Has your professional employment ever been suspended, diminished, revoked or terminated at any hospital or healthcare facility or are any proceedings that may result in any such action currently pending?

- Has your medical staff appointment/privileges ever been limited, suspended, diminished, revoked, refused/denied, terminated, restricted, not renewed, relinquished (whether voluntarily or involuntarily) at any hospital or healthcare facility or are proceedings currently pending which may result in any such action?

- Have you ever withdrawn (or voluntarily relinquished) your application for appointment, re-appointment or privileges or resigned from the medical staff because disciplinary action** or loss or restriction of clinical privileges was threatened or before a decision about your appointment and/or privileges was rendered by a hospital's or healthcare organization's governing board?

- Have you ever been the subject of disciplinary action or proceedings at any healthcare facility?

- Have you ever been investigated for scientific misconduct?

Reporting to the National Practitioner Data Bank compounds this impact.

**75.**     Hospitals and state licensing boards considering a physician's application for hospital privileges or a state medical license are permitted by statute to "query" information in the NPDB and often procedurally required to do so.

**76.** Hospitals query the NPDB for the granting, maintenance, or expansion of a physician's clinical privileges, including temporary locum tenens privileges.

**77.** Therefore, any adverse actions reported on the NPDB will be scrutinized by any future prospective hospital employer or medical organization, or any other organization.

**78.** Additionally, once a report is filed with the NPDB there may be updates or opportunities for the subject to respond, but the original report *cannot be removed.*

**79.** Therefore, its report to the NPDB will likely trigger disciplinary inquiries by other entities.

**80.** The aggressive manner in which Michigan Medicine has chosen to conduct the investigation of Dr. Doe appears to have been constructed to inflict maximum retributive damage to his reputation, even before the investigation was underway.

**81.** The impacts of loss of hospital privileges and reporting to the NPDB do not fully describe the limits to the irreparable professional damage to Dr. Doe.

**82.** Loss or limitation of hospital privileges can result in loss of American Board of Plastic Surgery Certification.

**83.** This certification requires that hospital privileges be unrestricted and that there be no adverse actions by the hospital.

**84.** Board Certification is a requirement of new privileging in multiple centers.

**85.** The actions of the Defendants will place a permanent red flag on any future application by Dr. Doe for privileges.

**86.** *In fact, Defendants recently took action denying Plaintiff's renewal of his clinical privileges, essentially converting the "recommendation" into a material adverse action before the internal adjudication has even been scheduled and violating its own rules yet again.*

**87.** The actions of Michigan Medicine, if allowed to remain, will permanently short-circuit the life's work of Dr. Doe. He may no longer be a board-certified plastic surgeon.

**88.** Finally, there is a long-lasting snowball effect. Federal laws and regulations governing the Medicare and Medicaid programs and the National Practitioner Data Bank (NPDB) are of paramount importance in the insurance and credentialing contexts for the medical profession.

**89.** Highly prejudicial disciplinary action (e.g., any loss of license or material restriction on practice, etc.) reported against a physician, can result in

disciplinary or legal "piling on" by other health care entities and insurance networks.

**90.** Due to the actions of Michigan Medicine, despite his previously impeccable reputation, Dr. Doe might not meet the professional or ethical qualifications required by credentialing entities and will face an uphill battle to maintain his license, certifications, and insurance provider contracts.

**91.** Michigan Medicine has taken the extra step of recommending a revocation of his clinical privileges, effectively ending his career and putting a permanent blemish on his reputation.

**92.** The revocation is a recommendation, not yet an action, and thus will not be reported to the NPDB at this time.

**93.** However, in an attempt to leverage a resignation, Michigan Medicine has unilaterally cut 60% of Dr. Doe's salary during the suspension (which is being challenged concurrently with the revocation) while Dr. Doe exercises his administrative remedies.

**94.** This 60% salary cut is not only egregious and being done in bad faith, it suggests that the outcome is foreordained despite Dr. Doe's right to a fair hearing.

**95.** The 60% salary cut would also prevent Dr. Doe's ability to maintain legal counsel while being forced to face multiple legal battles, including:

    a.  An administrative process to challenge the salary reduction.

    b.  An administrative process to challenge the suspension.

    c.  An administrative process to challenge the revocation.

    d.  A legal battle in court to address all of these issues at once.

### *Psychological Harm*

**96.**    Dr. Doe has already suffered irreparable psychological harm which will be only compounded by the actions of Michigan Medicine to rescind his credentialing.

**97.**    The trauma of working in a hostile environment, being subject to public humiliation by colleagues, isolation from colleagues, prevention from mentoring future surgeons, significant reduction in compensation, and the stress of persistent accusations and investigations, has done enormous psychological harm to Dr. Doe.

**98.**    The unjustified loss of privileges, together with the stress that comes with knowledge of the professional harm and the experience of the reputational harm caused by the actions of the Chief of Surgery and the Michigan Medicine Administration, caused further and potentially irreversible psychological harm.

**99.**    As in other cases of abuse, the mental trauma is long-lasting and can damage the individual as well as the family.

## COUNT I- 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT

### *Procedural Due Process*
### *Property and Liberty Interests*

**100.**   Plaintiff repeats and realleges all foregoing paragraphs as if they were fully set forth herein.

**101.**   The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person to life, liberty, or property, without due process of law."

**102.**   Fourteenth Amendment due process protections are required in higher education disciplinary decisions at public institutions where, as here, professors have a property interest in their positions.

**103.**   Plaintiff has a property interest in his medical staff privileges and his salary.

**104.**   These staffing privileges allow him to practice medicine and treat patients, something Plaintiff has earned after many years of training.

**105.**   Plaintiff was stripped of this right by Defendants without due process.

**106.**   This was done in a manner that violated the 14th amendment and the hospital's own policies.

**107.**   This would have required a fair hearing that has not yet taken place.

**108.**   Plaintiff has a protected liberty interest in his good name, reputation, honor, integrity, and character, and in pursuing his chosen profession in which he

has developed a national and international reputation, and which he cannot be deprived of by the state absent due process.

**109.**   That liberty interest is subject to the protections afforded by the Fourteenth Amendment to the Constitution of the United States.

**110.**   Plaintiff was entitled to a process commensurate with the seriousness of the allegations against him and the potential discipline, sanctions, and repercussions he was facing. Here the allegations were of the utmost seriousness and have life-long ramifications.

**111.**   There would have been no undue burden on Defendants to swiftly and efficiently provide due process-- and refrain from any negative reporting until that process is completed, in that the University already provides these due process protections to professors in their policies.

**112.**   Plaintiff has a significant interest in his practice, his salary, hospital privileges, reappointment, medical staff membership and privileges, and recertification.

**113.** Defendants intentionally withheld from Plaintiff all due process protections.

**114.**   Because the University provided a Fair Hearing process, it had the obligation to ensure that the process was completed in accordance with due process protections as proscribed by the United States courts and its own Policies and

Statements, before exercising any authority it may have to issue negative reports to administrative bodies that would be made public.

115. Plaintiff has suffered irreparable harm to his reputation as a result of such actions—including the denial of his clinical privileges and an upcoming scathing and defamatory report to the State of Michigan Board of Medicine and NPDB.

116. Plaintiff will suffer years of continuous financial damage as a result of this deprivation of his due process. This includes loss of referrals from colleagues, less procedures that will be performed, and potential employment and salary prospects.

117. Defendants violated their own policies and guidelines with regard to Plaintiff's due process rights, including their arbitrary salary reduction.

118. This requires physicians to have access to a fair hearing and appellate review when the medical staff makes an adverse decision regarding the medical privileges of a physician.

119. Defendants' denial of due process to Plaintiff was arbitrary and capricious, deliberately indifferent and fundamentally unfair.

120. As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury and damages, including but not limited to loss of career opportunities and earning capacity; damage to his standing

and associations in his community and imposition of a stigma or other disability that forecloses his freedom to take advantage of other employment opportunities; mental and emotional distress; humiliation and embarrassment; loss of personal and professional reputation;

**WHEREFORE,** Plaintiff is entitled to actual damages, statutory damages, costs, and reasonable attorney fees.

## COUNT II - BREACH OF CONTRACT

**121.**  Plaintiff repeats and realleges all foregoing paragraphs as if they were fully set forth herein.

**122.**  Defendants' violations of the medical staff by-laws constitute a breach of contract.

**123.**  Defendants repeatedly breached that contract by ignoring specified procedural requirements of the standard practice guide (SPG) and the by-laws. Defendants committed other specified violations of the SPG and by-laws in implementing its adverse actions.

**124.**  Defendants failed to follow its own bylaws when taking disciplinary actions against Dr. Doe. This includes specifically, but not limited to the following:

a.  Regents Bylaw Sec. 5.09

b.  Section 8.2-6 ECCA Action.

c.  Section 8.2-6 Exercise or Waiver of Procedural Rights

d.  Section 8.7- Precautionary Suspension or Restriction.

**125.**  The specific nature of each violation was brought to the attention of Defendants in a letter. **(See *Exhibit C: 4/27/2021 correspondence regarding formal hearing request,* provided under seal.)**

**WHEREFORE,** Plaintiff is entitled to actual damages, statutory damages, costs, and reasonable attorney fees.

## COUNT III - BREACH OF FIDUCIARY AND PUBLIC DUTIES

**126.**  Plaintiff repeats and realleges all foregoing paragraphs as if they were fully set forth herein.

**127.**  Defendant has a duty to its staff and the community at large to operate the hospital in the interest of public health care.

**128.**  Defendant has a duty to operate the hospital in a manner which permits the staff to meet its professional obligations to patients.

**129.**  Defendants violated these duties by suppressing dialogue and debate regarding patient care issues.

**130.**   Defendants violated these duties by ignoring the hospital and medical staff by-laws.

**131.**  Defendants violated these duties by improperly influencing members of hospital and staff committees.

**132.**  Defendants violated these duties by intimidating Plaintiff.

**133.**   Defendants violated these duties by referring Plaintiff to an institute in Kansas for the purpose of cementing the damage to his reputation.

**134.**   A separate opinion by a psychologist sent by UM found the opinions in the records produced by Defendant to be problematic and skewed.

**135.**   It later became evident that this referral was made with malice.

**136.**   Defendants violated these duties by retaliating against Plaintiff, by taking disciplinary action against Plaintiff, and by suspending his clinical privileges in a manner inconsistent with Michigan Medicine's policies and delaying continuity of care and treatment with patients that sought his services.

**WHEREFORE**, Plaintiff is entitled to actual damages, statutory damages, costs, and reasonable attorney fees.

## COUNT IV - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**137.**   Plaintiff repeats and realleges all foregoing paragraphs as if they were fully set forth herein.

**138.**   Defendants' actions, statements, and conduct were, and continue to be, extreme, outrageous, and beyond the bounds of common decency in a society.

**139.**   The Defendants are well-versed in the practice of medicine and the operations of a health system to know the effects such actions would have on a physician's career, ability to earn a living, and emotional psyche.

**140.**   Defendants' actions were intentional.

**141.**   Defendants acted with the intent to inflict emotional distress upon Plaintiff.

**142.**   Defendants sought to undermine the respect, credibility, and reputation of a seasoned physician with an impeccable reputation and to extend that diminution of stature to his very own residents in training.

**143.**   The actions of Michigan Medicine have wantonly damaged programs that the Plaintiff has spent decades building. Loss of morale among the team leading individuals to resign from their positions. The Plaintiff feels enormous distress due to the negative impacts on patients and colleagues.

**144.**   As a result, if all findings are in favor of the Plaintiff, Defendants' stated policies call for the removal of clinical privileges at the hospital.

**145.**   Defendants undermined the relationship between the Plaintiff and trainees.

**WHEREFORE,** Plaintiff is entitled to actual damages, statutory damages, costs, and reasonable attorney fees.

## <u>COUNT V - RETALIATION</u>

**146.**   Plaintiff repeats and realleges all foregoing paragraphs as if they were fully set forth herein.

**147.** Punishment of an employee by an employer for engaging in legally protected activity such as making a complaint of harassment or participating in workplace investigations.

**148.** Retaliation can include any negative job action, such as demotion, discipline, firing, salary reduction, or job or shift reassignment.

**149.** Plaintiff cited the following concerns: Plaintiff sent two letters that were very critical of how the health system operated along with an editorial criticizing how things were done at the medical center from both an administrative as well as a clinical standpoint. Plaintiff also cited the extent of the involvement of Mike Mulholland, then-Chairman of the Department of Surgery in rearranging staff and leadership.

**150.** One such letter is an editorial titled "Are the New Changes in Our Operating Rooms Really Making Us Safer and Better Surgeons?" published in 2013 by Dr. Doe in one of the major journals of the University.

**151.** Mike Mulholland is currently the Vice Senior associate dean of clinical affairs in the Medical School, effective June 1, 2019. He had served as executive director of the University of Michigan Medical Group (UMMG) since January 2019.

**152.** Following Plaintiff's citation of these concerns, a dramatic shift in behavior and tone came from Defendants, followed by subsequent adverse actions.

**153.** The response of the Defendants has been to ignore these issues in favor of retaliatory professionalism complaints against the Plaintiff.

**154.** When the Plaintiff raised professionalism concerns, they were dismissed by Defendants.

**155.** All of these matters were in direct retaliation to Plaintiff's legally protected activity involving improper conduct in the workplace and his subsequent complaint to the appropriate leadership chain.

**WHEREFORE**, Plaintiff is entitled to actual damages, statutory damages, costs, and reasonable attorney fees.

## <u>COUNT VI - INJUNCTIVE RELIEF</u>

**156.** Plaintiff repeats and realleges all foregoing paragraphs as if they were fully set forth herein.

**157.** At all times relevant hereto, Defendants acted under color of state law to deprive Plaintiff of property interests protected by the Constitution of the United States of America.

**158.** The property rights asserted herein are clearly established and expressly enumerated in the plain test of the Fourteenth Amendment.

**159.** As a result of the wrongful actions of Defendants, Plaintiff has been wrongfully deprived of his property interests by governmental action by state actors, without due process of law.

160. The deprivations of property interests were caused by wrongful, administrative actions that demonstrated a deliberate indifference to whether harm would result to Plaintiff.

161. Defendants each objectively and individually knew of facts from which a substantial risk of harm could be inferred, and Defendants each subjectively and individually did infer such risk of harm to Plaintiff.

162. Alternatively, Defendants' actions causing the deprivations of Plaintiff's property interests were taken for reasons that were arbitrary, capricious and/or shock the conscience.

163. Because of Defendants' deliberately indifferent, arbitrary, capricious, and conscious-shocking conduct, Plaintiff has been deprived of his property interests without due process of law.

164. As a direct and proximate result of Defendants' conduct Plaintiff has suffered extensive damages, past, present, and future, including but not limited to: to loss of career opportunities and earning capacity; damage to his standing and associations in his community and imposition of a stigma or other disability that forecloses his freedom to take advantage of other employment opportunities; mental and emotional distress; humiliation and embarrassment; loss of personal and professional reputation.

**165.**   Plaintiff demands injunctive relief to return Plaintiff to the status quo, as the Court may deem equitable under the circumstances, including but not limited to reinstatement to his practice, hospital privileges, reappointment, medical staff membership and privileges, and recertification—along with a maintenance (no reduction of any kind) to his current salary.

## **RELIEF REQUESTED**

Plaintiff demands judgment against Defendants as follows:

A.   Equitable Relief:

1.   An order that prohibits Defendants and any of its employees or any other representative of Defendants from notifying the NPDB or State of Michigan Board of Medicine of Plaintiff suspension.

2.   An order that reinstates Plaintiff into full practice unless a formal investigation is concluded finding that his continued practice would constitute a threat to patient safety.

3.   An order that prevents Michigan Medicine from reducing Dr. Doe's salary in any way until all allegations that have been brought against him are fully adjudicated and brought to a conclusion.

4.   An Order putting Plaintiff into the position he would have been absent a violation of his rights and finding against him;

5.   A ruling that, as a matter of law, Plaintiff's due process rights were violated;

6.   An award of interest, costs and reasonable attorney fees; and

7.   Whatever other equitable relief appears appropriate at the time of final judgment.

31

B.   Legal Relief:

1.  Twelve Million ($12,000,000) Dollars compensatory damages in whatever amount he is found to be entitled;

2.  Exemplary damages in whatever amount he is found to be entitled;

3.  Twenty Million ($20,000,000) Dollars punitive damages in whatever amount he is found to be entitled; and

4.  An award of interest, costs, reasonable attorney fees, and expert witness fees.

5.  Clinical privileges restored;

6.  Board Certification renewed; and

7.  Name cleared in the NPDB with a full retraction statement.

## VERIFICATION

I, Dr. ▮▮▮▮▮▮▮, M.D., verify that I have read the above Complaint and its contents.  I also verify that to the best of my knowledge and recollection, the matters stated in the Complaint are true and correct. ▮▮▮▮▮▮▮

Dated:  December 22, 2021

Dr. ▮▮▮▮▮▮▮, M.D.

Signed before me by Dr. ▮▮▮▮▮▮, M.D., on the 22nd day of December, 2021.

*Kimberly Ann Blackmore*

Kimberly Ann Blackmore

Notary public, State of Michigan, County of Monroe
My commission expires:  November 6, 2027
Acting in the County of Washtenaw

KIMBERLY ANN BLACKMORE
Notary Public - State of Michigan
County of Monroe
My Commission Expires Nov 6, 2027
Acting in the County of Washtenaw

Respectfully submitted,

*/s/ Saif R. Kasmikha*
Saif R. Kasmikha (P74320)

Dated: December 29, 2021   Midwest Legal Partners, PLLC
Attorney for Plaintiff
42705 Grand River Avenue, Suite 201,
Novi, MI 48375
Office: (248) 344-4570
E-mail: skasmikha@midwestlegalpartners.com

Ronald G. Acho
Cummings, McClorey, Davis & Acho, P.L.C.
17436 College Parkway
Livonia, MI  48152
(734) 261-2400
Attorney for Plaintiff
Email: racho@cmda-law.com
P-23913

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JOHN DOE, M.D.,

     Plaintiff,

v                                      CASE NO.
                                        HON.

THE BOARD OF REGENTS OF THE
UNIVERSITY OF MICHIGAN, MARIE LOZON,
M.D., and JUSTIN DIMICK, M.D., Individually,

     Defendants.

_____/

| | |
|---|---|
| MIDWEST LEGAL PARTNERS, PLLC | CUMMINGS, McCLOREY, DAVIS |
| By: **SAIF R. KASMIKHA** (P74320) | & ACHO, P.L.C. |
| 42705 Grand River Avenue | By: **RONALD G. ACHO**  (P23913) |
| Suite 201 | 17436 College Parkway |
| Novi, MI   48375 | Livonia, MI 48152 |
| (248) 344-4570 | (734) 261-2400 |
| Attorneys for Plaintiff | Attorneys for Plaintiff |
| skasmikha@midwestlegalpartners.com | racho@cmda-law.com |

_____/

## <u>DEMAND FOR TRIAL BY JURY</u>

    **NOW COMES** the Plaintiff, JOHN DOE, M.D., by and through his attorneys, MIDWEST LEGAL PARTNERS, PLLC, by SAIF R. KASMIKHA, and CUMMINGS, McCLOREY, DAVIS & ACHO, PLC by RONALD G. ACHO and hereby demands trial by jury of the above-entitled cause of action.

Respectfully submitted,

*/s/ Saif R. Kasmikha*

Saif R. Kasmikha (P74320)

Dated: December 29, 2021   Midwest Legal Partners, PLLC

Attorney for Plaintiff

42705 Grand River Avenue, Suite 201,

Novi, MI 48375

Office: (248) 344-4570

E-mail: skasmikha@midwestlegalpartners.com

Ronald G. Acho

Cummings, McClorey, Davis & Acho, P.L.C.

17436 College Parkway

Livonia, MI  48152

(734) 261-2400

Attorney for Plaintiff

Email: racho@cmda-law.com

P-23913