# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JOHN DOE, M.D.,

     Plaintiff,

v.                                     CASE NO.
                                        HON.

THE BOARD OF REGENTS OF
THE UNIVERSITY OF MICHIGAN,
MARIE LOZON, M.D., and
JUSTIN DIMICK, M.D., Individually,

     Defendants.

_____/

| MIDWEST LEGAL PARTNERS, PLLC | CUMMINGS, McCLOREY, DAVIS |
|---|---|
| By: **SAIF R. KASMIKHA** (P74320) | & ACHO, P.L.C. |
| 42705 Grand River Avenue | By: **RONALD G. ACHO** (P23913) |
| Suite 201 | 17436 College Parkway |
| Novi, MI   48375 | Livonia, MI 48152 |
| (248) 344-4570 | (734) 261-2400 |
| Attorneys for Plaintiff | Attorneys for Plaintiff |
| skasmikha@midwestlegalpartners.com | racho@cmda-law.com |

_____/

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE ISSUED

**NOW COMES** Plaintiff, DR. JOHN DOE, M.D., by and through his attorneys, MIDWEST LEGAL PARTNERS, PLLC, by SAIF R. KASMIKHA, and CUMMINGS, McCLOREY, DAVIS & ACHO, PLC by RONALD G. ACHO, and for his Motion for Temporary Restraining Order and Order to Show Cause Why A Preliminary Injunction Should Not Be Issued, states as follows:

1.      The matter before the Court today arises because of Plaintiff's mistreatment by Defendant Michigan Medicine, despite his impressive educational, clinical, and research accomplishments. Plaintiff is a man of integrity performing lifesaving and life changing procedures for children.

2.      Plaintiff files this case anonymously because of the extremely sensitive nature of the case, as Plaintiff's stellar reputation is a critical component to ensuring the public's trust for him to operate on their children for complex procedures, and Defendants' threat to report his suspension to the National Practitioner Data Bank and the State of Michigan Board of Medicine would cause irreparable damage to his reputation and career. As a result, this suit will require disclosure of information "of the utmost intimacy", and therefore, Plaintiff is entitled to protect his identity in this public filing by not disclosing his name. *Doe v. Porter*, 370 F.3d 558, 569 (6th Cir. 2004), citing *Doe v. Stegall*, 653 F.2d 180, 185-186 (5th Cir., 1981). See also *Doe v. Community Medical Center*, 353 Mont. 378; 221 P.3d 651 (Mont. 2009).

3.      Plaintiff is a world-renowned pediatric plastic surgeon with an impeccable reputation.

4.      Plaintiff is a Tenured Professor of Surgery in the Section of Plastic & Reconstructive Surgery and holds a joint appointment as a Professor of Neurosurgery at the University of Michigan Medical School.

5.     Plaintiff has practiced for 33 years as a surgeon, with 28 years as a plastic surgeon, specializing in craniofacial surgery, craniofacial anomalies, cleft lip, cleft palate, and craniosystosis.

6.     Plaintiff is the Director of the Craniofacial Anomalies Program at the University of Michigan Medical Center and the Chief of Pediatric Plastic Surgery at the C.S. Mott Children's Hospital.

7.     Plaintiff's current employment requires a unique set of skills.

   a. These skills took decades to attain certification and even longer to master.

   b. Plaintiff's stellar reputation is a critical component to ensuring the public's trust to operate on their children for complex procedures. This reputation and background has been touted often and publicly by Defendant to assure the general public that their children are in safe hands by bringing them to the institution.

   c. Continuity of practice is essential to maintain that skillset and ensure the safety of the public. The effect on scheduling logistics and patient care have been detrimental. This has been expressed by Defendant's employees and patients.

   d. An extended absence or suspension from practice could harm Plaintiff's reputation, diminish skills, and endanger the trust and safety

3

of the public in the future.

8. Defendants issued written notice to Plaintiff dated on March 19, 2021 and March 27, 2021 that it intends to his suspension from practice to the National Practitioner Data Bank ("NPDB") and the State of Michigan Board of Medicine, that the suspension is indefinite, and that the issues likely will not be adjudicated anytime soon.

9. Reporting to the NPDB and the State of Michigan Board of Medicine before any allegations against him are investigated or adjudicated would cause irreparable damage to his reputation and his career.

10. Plaintiff will suffer irreparable harm from reporting to these agencies and continued prohibition from clinical practice.

11. Based upon information and belief, the report to the NPDB and State of Michigan Board of Medicine could stay on the public record for at least two years, because the matter could take a year to go through Defendant's internal processes and Peer Review. This means that Plaintiff could also be out of practice during that time frame.

12. Plaintiff seeks entry of a Temporary Restraining Order pursuant to Fed.R.Civ.P. 65(b), restraining Defendants from submitting any report to the NPDB or to the State of Michigan Board of Medicine before any allegations against him are investigated or adjudicated, until such time as Plaintiff can be heard by the Court

on his request from preliminary injunctive relief.

13.     Further, after due hearing of the evidence, pursuant to Fed.R.Civ.P. 65(b), Plaintiff requests that this Court issue an injunction enjoining Defendants, or any party aware of the Order of this Court, from issuing any report to the NPDB or to the State of Michigan Board of Medicine regarding the Plaintiff, retracting/correcting any report, and immediately reinstating Plaintiff to practice. Plaintiff shall be reinstated into full, unrestricted practice unless a formal investigation, replete with due process, concludes with a finding that his continued practice would constitute a threat to patient safety.

14.     Defendants are either aware or should be fully aware of the damage such actions could cause to the Plaintiff, to the patients seeking his unique skills and surgical services, and to the general public.

15.     Defendants will incur no harm from refraining from sending or correcting any reports to the NPDB and Michigan's Medical Board if this court orders that Defendants refrain from doing so until the matters brought forward are investigated and adjudicated.

16.     Defendants will incur no harm from restoring Plaintiff's clinical privileges.

17.     Should an injunction issue, there will be no harm or added obligation imposed upon Defendants.

18.     Pursuant to Fed.R.Civ.P. 65(b), Plaintiff personally requested that Defendants immediately reinstate him to his position, through an email communication directed to Defendant Marie Lozon on December 21, 2021. He further advised that if reinstatement did not occur, he would file suit and seek immediate reinstatement through injunctive relief.

19.     Further, both attorneys for the Defendants were notified via email on the morning of December 28, 2021 that Plaintiff would be filing suit and seeking immediate reinstatement through a temporary restraining order, as well as injunctive relief. See Fed.R.Civ.P. 65(b).

20.     Prior to filing suit, and the instant Motion, Plaintiff's counsel notified David French and Larry Jenson, attorneys for the Defendants, and sought concurrence in the relief requested in this Motion. Said relief was not obtained, necessitating the filing of this Motion.

**WHEREFORE**, Plaintiff respectfully requests that the Court immediately enter a temporary restraining order and order to show cause why a preliminary injunction prohibiting Defendants and any agent of Defendants, including any person or entity in active concert or participation with Defendants or acting under Defendant's direction and control who receive notice of the order, to order the following:

a. Defendant shall be enjoined from reporting to the NPDB (or correcting/retracting any published report), State of Michigan Board of Medicine, or any other entity regarding Plaintiff's temporary but indefinite suspension from practice; and

b. Defendant shall reinstate Plaintiff to practice immediately. Plaintiff shall be reinstated into full, unrestricted practice unless a formal investigation, replete with due process, concludes with a finding that his continued practice would constitute a threat to patient safety.

Respectfully submitted,

/s/ Saif R. Kasmikha

Dated: December 29, 2021

Saif R. Kasmikha (P74320)
Midwest Legal Partners, PLLC
Attorney for Plaintiff
42705 Grand River Avenue, Suite 201,
Novi, MI 48375
Office: (248) 344-4570
E-mail: skasmikha@midwestlegalpartners.com

Ronald G. Acho
Cummings, McClorey, Davis & Acho, P.L.C.
17436 College Parkway
Livonia, MI 48152
(734) 261-2400
Attorney for Plaintiff
Email: racho@cmda-law.com
P-23913

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JOHN DOE, M.D.,

     Plaintiff,

v.                                        CASE NO.
                                              HON.

THE BOARD OF REGENTS OF
THE UNIVERSITY OF MICHIGAN,
MARIE LOZON, M.D., and JUSTIN
DIMICK, M.D.,  Individually,

     Defendants.

_____/

| | |
|---|---|
| MIDWEST LEGAL PARTNERS, PLLC | CUMMINGS, McCLOREY, DAVIS |
| By: **SAIF R. KASMIKHA** (P74320) | & ACHO, P.L.C. |
| 42705 Grand River Avenue | By: **RONALD G. ACHO**  (P23913) |
| Suite 201 | 17436 College Parkway |
| Novi, MI   48375 | Livonia, MI 48152 |
| (248) 344-4570 | (734) 261-2400 |
| Attorneys for Plaintiff | Attorneys for Plaintiff |
| skasmikha@midwestlegalpartners.com | racho@cmda-law.com |

_____/

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE ISSUED

## <u>TABLE OF CONTENTS</u>

Executive Summary ..................................................................................................1

Summary of Factual Background .............................................................................2

Argument...................................................................................................................7

Standard of Review...................................................................................................7

    I.    The Application of the Four Factors Favors Plaintiff, and His
          Request For Relief, and He Is Entitled to Injunctive Relief. ...................10

Conclusion ..............................................................................................................20

## INDEX OF AUTHORITIES

## Cases

*Blount v. Societe Anonyme du Filtre Chamberland Systeme Pasteur*,
53 F. 679 (1892)..........................................................................................................8

*Brooks v. Arlington Hosp. Ass'n,* 850 F.2d 191 (4th Cir.1988)................................17

*Diaz v. Provena Hosps.*, 352 Ill.App.3d 1165; 288 Ill. Dec. 81;
817 N.E.2d (2 Dist. 2004)........................................................................................19

*DeVere v. State,* 149 N.H. 674; 827 A.2d 997 (2003)...........................................18

*Doe v. Community Medical Center*, 353 Mont. 378;
221 P.3d 651 (Mont. 2009).................................................................3, 5, 15, 16, 17

*Doe v. Porter*, 370 F.3d 558 (6th Cir. 2004).............................................................3

*Doe v. Stegall*, 653 F.2d 180 (5th Cir., 1981)...........................................................3

*Eidelson v. Archer,* 645 P.2d 171(Alaska 1982).....................................................17

*Garrett v. Board of Education of School District of Detroit,*
 775 F. Supp. 1004 (E.D. Mich., 1991).......................................................................9

*Garrow v. Elizabeth Gen. Hosp. & Dispensary,* 79 N.J. 549;
401 A.2d 533 (1979)................................................................................................17

*In re Delorean Motor Co.*, 755 F.2d 1223 (6th Cir., 1985)......................................9

*International Longshoremen's Association, AFL-CIO Local Union
No. 1937 v. Norfolk S. Corp.*, 927 F.2d 900 (6th Cir., 1991),
cert. den. 502 U.S. 813 (1991)..................................................................................9

*Knapik v. Mary Hitchcock Mem'l Hosp.*,
90 F. Supp. 3d 292 (D. Vt. 2015).............................................................17, 18, 19

*Meagher v. Butte-Silver Bow City-County*, 337 Mont. 339;
160 P.3d 552; 2007 MT 129 (2007).......................................................................16

*Nemazee v. Mt. Sinai Med. Ctr.,* 56 Ohio St. 3d 109;
564 N.E. 2d 477 (1990).................................................................17

*Parks v. Ala. State Bd. Of Pharmacy (Ex Parte Ala. State
Bd. Of Pharmacy)*, 253 So. 3d 972 (Ala. Civ. App. 2017)......................19

*Performance Unlimited, Inc. v. Questar Publishers, Inc.*,
52 F.3d 1373 (6th Cir., 1995)..................................................8, 9

*Soentgen v. Quain & Ramstad Clinic, P.C.,*
467 N.W. 2d 73 (N.D.1991) ......................................................17

*Westlake Cmty. Hosp. v. Superior Court,* 17 Cal.3d 465;
131 Cal.Rptr. 90; 551 P.2d 410 (1976)............................................17

## Statutes

42 U.S.C. § 11133(a)(1)(A) ......................................................16

§ 37-3-403, MCA ..............................................................16

## Court Rules

Fed.R.Civ.P. 65 ...............................................................7

Fed.R.Civ.P. 65(b) ..........................................................7, 8

## <u>CONCISE STATEMENT OF THE ISSUES PRESENTED</u>

I.   IS PLAINTIFF ENTITLED TO INJUNCTIVE RELIEVE
BECAUSE THE APPLICATION OF THE FOUR FACTORS
FAVORS PLAINTIFF, AND HIS REQUEST FOR RELIEF?

**Plaintiff says "Yes".**

**Defendants would say "No".**

## <u>MOST APPROPRIATE AUTHORITY FOR THE RELIEF SOUGHT</u>

### <u>Cases</u>

*Doe v. Community Medical Center*, 353 Mont. 378;
221 P.3d 651 (Mont. 2009) ..................................................................3, 5, 15, 16, 17

*In re Delorean Motor Co.*, 755 F.2d 1223 (6th Cir., 1985).......................................9

*Knapik v. Mary Hitchcock Mem'l Hosp.*,
90 F. Supp. 3d 292 (D. Vt. 2015).................................................................17, 18, 19

*Meagher v. Butte-Silver Bow City-County*, 337 Mont. 339;
160 P.3d 552; 2007 MT 129 (2007).........................................................................16

*Parks v. Ala. State Bd. Of Pharmacy (Ex Parte Ala. State
Bd. Of Pharmacy)*, 253 So. 3d 972 (Ala. Civ. App. 2017).....................................19

*Performance Unlimited, Inc. v. Questar Publishers, Inc.*,
52 F.3d 1373 (6th Cir., 1995)...............................................................................8, 9

**NOW COMES** Plaintiff, DR. JOHN DOE, MD by and through his attorneys, MIDWEST LEGAL PARTNERS, PLLC, by SAIF R. KASMIKHA, and CUMMINGS, McCLOREY, DAVIS & ACHO, PLC by RONALD G. ACHO, and for his Brief in Support of his Motion for Temporary Restraining Order and Order to Show Cause Why A Preliminary Injunction Should Not Be Issued, states as follows:

## EXECUTIVE SUMMARY

- Dr. Doe is seeking a preliminary injunction from an improper suspension.

- He is a world-renowned pediatric plastic surgeon specializing in repairing craniofacial anomalies, cleft lip, cleft palate, and craniosystosis in children. Dr. Doe is a Tenured Professor of Surgery in the Section of Plastic & Reconstructive Surgery, holds and endowed chair in the Department of Surgery, and holds a joint appointment as a Professor of Neurosurgery at the University of Michigan Medical School. He has been recognized on numerous occasions for his outstanding achievements.

- Dr. Doe recently won a plastic surgery achievement award from the American Association of Plastic Surgeons (AAPS) the oldest, most prestigious, and one of the most selective national plastic surgical organizations in the country.

- Dr. Doe has personally mentored over 200 Undergraduate & Graduate Students, Residents, & Post-Doctoral Fellows in Plastic Surgery Research, one of the highest of any plastic surgery professor in the country in terms of mentorship.

- Dr. Doe is the only Plastic Surgeon in the country/world that is the principal investigator of a plastic surgery training grant from the National Institutes of Health to teach surgical trainees from all over the country on how to become surgical scientists. Through his past efforts, he is placed in the top 5% of all

1

plastic surgeons in the world with regard to securing grant funding for his/her respective institution and has 2 U.S. Patents as a result of his innovation and ingenuity.

- He won the best published plastic surgery paper award of the year in multiple years including 2004, 2011, two in 2013, and 2015 from multiple national plastic surgery organizations.

- Dr. Doe's publications have served as the gold standard for prospective surgeons wishing to pursue his field. This includes, but is not limited to, over 340 clinical and research articles published in peer reviewed scientific journals; his scientific and clinical papers have been presented at over 525 local, regional, national and international medical/surgical meetings; authoring, co-authoring, and editing 21 chapters in plastic surgery textbooks along with two (2) major plastic surgery texts, one of which is considered to be the authoritative atlas/text in craniofacial surgery.

- The Defendants have used his likeness for many promotional materials for the University of Michigan, including posters, signs, and ads. He has been used to tout the University's talent in this field, which has brought in patients and competitive surgery candidates.

- Dr. Doe boasts an unblemished clinical record, spanning over 28 years at the University of Michigan. Any audits, reviews for insurance approval and billing purposes, and reviews by Risk Management/Office of Clinical Safety have raised no practice or documentation concerns.

- The suspension was improperly placed against him, both as a matter of equity and against the University's own bylaws. His immediate return to practice is critical to the retention of his skills, the care of his patients, and substantive due process that affects the public at large.

- There is no detriment to the Defendants by granting this preliminary injunction.

## SUMMARY OF FACTUAL BACKGROUND

Plaintiff files this case anonymously because of the extremely sensitive

nature of the case, as Plaintiff's stellar reputation is a critical component to ensuring the public's trust for him to operate on their children for complex procedures, and Defendants' threat to report his suspension to the National Practitioner Data Bank and the State of Michigan Board of Medicine would cause irreparable damage to his reputation and career. As a result, this suit will require disclosure of information "of the utmost intimacy", and therefore, Plaintiff is entitled to protect his identity in this public filing by not disclosing his name. *Doe v. Porter*, 370 F.3d 558, 569 (6th Cir. 2004), citing *Doe v. Stegall*, 653 F.2d 180, 185-186 (5th Cir., 1981). See also *Doe v. Community Medical Center*, 353 Mont. 378; 221 P.3d 651 (Mont. 2009).

Plaintiff is a world-renowned pediatric plastic surgeon with an impeccable reputation. (***Exhibit A***: Complaint, ¶11). Plaintiff is a Tenured Professor of Surgery in the Section of Plastic & Reconstructive Surgery, holds an endowed chair in the Department of Surgery, and holds a joint appointment as a Professor of Neurosurgery at the University of Michigan Medical School. *Id.*, at ¶12. Plaintiff has practiced for 33 years as a surgeon, with 28 years as a plastic surgeon, specializing in craniofacial surgery, craniofacial anomalies, cleft lip, cleft palate, and craniosystosis. *Id.*, at ¶13. Plaintiff is the Director of the Craniofacial Anomalies Program at the University of Michigan Medical Center and the Chief of Pediatric Plastic Surgery at the C.S. Mott Children's Hospital. *Id.*, at ¶14.

Plaintiff is a past Chairman of the Plastic Surgery Research Council, past president of the American Society of Maxillofacial Surgery, past President of the Michigan Academy of Plastic Surgery, past president of the American Society of Craniofacial Surgery, and currently serves on the board of the American Association of Plastic Surgeons. *Id.*, at ¶ 15. Plaintiff has won numerous awards for his excellence in teaching, research, and clinical care; lectures worldwide as an invited speaker on the science and practice of craniofacial surgery; and has also authored many book chapters and published a substantial number of articles in peer reviewed journals. *Id.*, at ¶ 16.

His active participation in multiple departments underscores the multidisciplinary nature of his clinical and research activities. *Id.*, at ¶29. Plaintiff has also been used personally, including his likeness, for many promotional materials for the University of Michigan, including posters, signs, and ads. *Id.*, at ¶30. (See *Exhibit B*: Promotional Materials, provided under seal).

From any objective standpoint, Plaintiff has an unblemished clinical record. *Id.*, at ¶ 31. Over 28 years at the University of Michigan, any audits, reviews for insurance approval and billing purposes, and reviews by Risk Management/Office of Clinical Safety have raised no practice or documentation concerns, other than routine matters. *Id.*, at ¶ 32.He has no significant patient complaints about his care, including any by patients who may have experienced complications. *Id.*, at ¶ 33.

4

His relationships with patients are, and have always been, excellent. *Id.*, at ¶ 34. All objective measures of performance, as a medical doctor, have similarly raised no concerns. *Id.*, at ¶ 35.

The matter before the Court today arises because of his mistreatment by Defendant Michigan Medicine, despite his impressive educational, clinical, and research accomplishments, Plaintiff is a man of integrity performing lifesaving and life changing procedures for children. *Id.*, at ¶ 36.

Defendants issued written notice to Plaintiff dated on March 19, 2021 and March 27, 2021 that it intends to report his suspension to the National Practitioner Data Bank[1] and the State of Michigan Board of Medicine, that the suspension is indefinite, and that the issues likely won't be adjudicated anytime soon. (***Exhibit C:*** Defendants' 3/27/2021 notice regarding Plaintiff's rights to hearing, provided under seal; see also ***Exhibit D***: Defendants' 4/20/21 letter requesting that Plaintiff submit a formal hearing request, provided under seal.) Defendants are either aware or should be fully aware of the damage such actions could cause to the Plaintiff, to the patients seeking his unique skills and surgical services, and to the general public. Reporting to the NPDB before any allegations against him are investigated

---

[1] The National Practitioner Data Bank ("NPDB") is a national repository for notices of all malpractice settlements, adverse actions, against hospital privileges and state licensure actions against physicians. *Doe v. Community Medical Center*, 353 Mont. at 382, fn4. A facility that suspends a physician for a period of thirty days or more must report the suspension to the NPDB. *Id.*

or adjudicated would cause irreparable damage to his reputation and his career. Plaintiff advised Defendants of the specific nature of each violation at the time he requested a formal hearing. (See *Exhibit E:* 4/27/2021 correspondence from Plaintiff submitting a formal hearing request to Defendants, provided under seal.)

Defendants will incur no harm from refraining from sending or correcting any reports to the NPDB and State of Michigan Board of Michigan if this Court orders that Defendants refrain from doing so until the matters brought forward are investigated and adjudicated. Defendants will incur no harm from restoring Plaintiff's clinical privileges.

Any harm that would be incurred by Defendants (which would be non-existent) is far outweighed by the damage that would be inflicted to Plaintiff and the general public. Plaintiff's current employment requires a unique set of skills:

    a. These skills took decades to attain certification and even longer to master.

    b. Plaintiff's stellar reputation is a critical component to ensuring the public's trust to operate on their children for complex procedures. This reputation and background has been touted often and publicly by Defendant to assure the general public that their children are in safe hands by bringing them to the institution.

c.  Continuity of practice is essential to maintain that skillset and ensure the safety of the public. The effect on scheduling logistics and patient care have been detrimental. This has been expressed by Defendant's employees and patients. (***See Exhibit F:*** email from surgery scheduler outlining concerns and issues caused by Plaintiff's suspension, provided under seal.)

d.  An extended absence or suspension from practice could harm Plaintiff's reputation, diminish skills, and endanger the trust and safety of the public in the future.

Based upon information and belief, the report to the NPDB and State of Michigan Board of Medicine could stay on the public record for at least two years, because the matter could take a year to go through Defendant's internal processes and Peer Review. This means that Plaintiff could also be out of practice during that time frame.

Plaintiff will suffer irreparable harm from reporting to these agencies and continued prohibition from clinical practice.

## **ARGUMENT**

**Standard of Review.**

Fed.R.Civ.P. 65 governs the issuance of temporary restraining orders and preliminary injunctions. Pursuant to Rule 65(b), a temporary restraining order

7

without written or oral notice to the adverse party when:

    (1)   It clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and

    (2)   The applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give notice and the reasons supporting the claim that notice should not be required.

Fed.R.Civ.P. 65(b).

Pursuant to Rule 65(b), Plaintiff personally requested that Defendants immediately reinstate him to his position, through an email communication directed to Defendant Marie Lozon on December 21, 2021. He further advised that if reinstatement did not occur, he would file suit and seek immediate reinstatement through injunctive relief. Further, both attorneys for the Defendants were notified via email on the morning of December 28, 2021 that Plaintiff would be filing suit and seeking immediate reinstatement through a temporary restraining order, as well as injunctive relief.

"The object and purpose of a preliminary injunction is to preserve the existing state of things until the rights of the parties can be fairly and fully investigated." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1378 (6th Cir., 1995); quoting *Blount v. Societe Anonyme du Filtre Chamberland Systeme Pasteur*, 53 F. 679, 682 (1892). The legal discretion of the

Court in acting upon applications for preliminary injunctions is largely controlled by the consideration that the injury to the moving party, arising from a refusal of the writ, is certain and great, while the damage to the party complained of, by the issuance of the injunction is slight or inconsiderable. *Id.*

The four factors for a court to consider in deciding to grant a preliminary injunction are:

(1) the likelihood of plaintiff's success on the merits;

(2) whether the injunction will save the plaintiff from irreparable injury;

(3) whether the injunction would harm others; and

(4) whether the public interest would be served.

*Performance Unlimited, Inc.*, 52 F.3d at 1381, citing *International Longshoremen's Association, AFL-CIO Local Union No. 1937 v. Norfolk S. Corp.*, 927 F.2d 900, 903 (6th Cir., 1991), cert. den. 502 U.S. 813 (1991). See also *Garrett v. Board of Education of School District of Detroit,* 775 F. Supp. 1004, 1006 (E.D. Mich., 1991), citing *In re Delorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir., 1985).

While Courts traditionally utilize these four factors, there is no set formula governing their application. The Sixth Circuit has noted:

> "A district court is required to make specific findings concerning each of the four factors, unless fewer are dispositive of the issue. Moreover, the four factors are not

>    prerequisites to be met, but rather must be balanced as part of
>    a decision to grant or deny injunctive relief."

*Performance Unlimited, Inc.*, 52 F.3d at 1381, quoting *In re Delorean Motor Co.*,

*supra*.

## I. The Application of the Four Factors Favors Plaintiff, and His Request For Relief, and He Is Entitled to Injunctive Relief.

### A. Plaintiff's claim will likely succeed on its merits.

As previously stated, Plaintiff is a world-renowned pediatric plastic surgeon

with an impeccable reputation, touted repeatedly over the years by Defendants for

his clinical skills and innovative practices. The recent adverse actions of the

University, while reflecting a shift in culture for the way it has treated its

physicians and tenured professors, remain meritless with a brazen disregard of the

facts and its own bylaws. Review of the text of these bylaws and other internal

policies show that Plaintiff will likely prevail on the merits of his claim.

Plaintiff is not a threat to patient safety. In fact, his clinical skills have been a

model for consistency in excellence for well over 20 years at the University—so

much that he has been promoted publicly in Defendants' efforts to procure grants

and patients. Threats to patient safety or loss of surgical skills has not even been

alleged by Defendants or any of Plaintiff's colleagues. To date there has been no

notification regarding a review of his cases by any committee or experts, or

indication that he has engaged in substandard techniques or fallen below the

standard of care. This is the basis for peer review and the intent of the drafters to improve those clinical settings through candor and confidentiality—and that's absent in this case. A balance of equities clearly establishes that Plaintiff should return to practice. It is also worth noting that surgical skills *could* be diminished, and patient safety could be a factor if Plaintiff is forced out of practice and having to go through an indefinite internal administrative process unrelated to his clinical care for years at a time before seeing another patient. Furthermore, Plaintiff is not seeking to avoid the internal process, nor is he filing a lawsuit in lieu of addressing any allegations through the hospital system. Plaintiff is seeking this court's intervention to ensure that the process is carried out equitably, with due process, and in accordance with Defendant's bylaws until the matter is fully adjudicated. It is not a request to resolve the dispute, but to allow for the parties to resolve it equitably by preventing Defendant from issuing multiple harsh punitive actions before the matter is resolved or concluded.

### B. The Injunction Will Not Harm Others, and Will Spare Others From Harm, Because Plaintiff's Patients Suffer Along With the Plaintiff in his Continued Absence From the Operating Room.

Patients suffer not in the sense of just an operation they may miss. The nature of Plaintiff's practice is to care for children with craniofacial anomalies that need to be cared for serially with tactical operations made using timing that is informed by his clinical judgement. These children and their parents have put their

trust in Plaintiff and withdrawing his ability to participate in their care harms them and forces them to either change the potential timing of these important operations or make connections with new and unfamiliar doctors as to their care and the undertaking of their risky operations.

The key timing issues and the time sensitive nature of operations clearly demonstrate irreparable harm stemming from Plaintiff's continued absence. This cannot be remedied by money damages. The public interest must be considered as it is paramount here.

The craniofacial program is losing patient's and losing prestige. The market is not saturated with experienced pediatric plastic surgeons. This may not be able to be rehabilitated after all the years it took to build one of the best craniofacial programs in the country. There has been a significant decrease in the numbers of patients and volume of craniofacial operations.

### C. Injunctive Relief Will Spare Plaintiff From Irreparable Injury Because His Reputation Continues to Suffer in a Manner that Money Damages Would Not Sufficiently Remedy.

Plaintiff is regularly getting phone calls from colleagues across the nation asking why he would be under this cloud, why he is not practicing, and why they can't refer patients to him. Injury to reputation or goodwill is not sufficiently remedied by court ordered monetary compensation. In this case, a return to practice is the only way. The hospital could show that the risk to patients was

12

greater if the surgeon were allowed to continue to practice while the hospital conducted hearings on the termination of privileges. This is clear because patient safety is not even at issue here. In fact, while some of these issues were addressed, before the hospital took any disciplinary action, Plaintiff was allowed to continue practice and did so faithfully without incident or harm. The hospital bylaws themselves call for an abeyance of the adverse recommendation until everything is adjudicated.

Plaintiff cannot become a candidate or serve on boards or national committees that require an attestation that he is not currently suspended from clinical practice. Some of these time constrained opportunities have age limits or stages that require years to make the appropriate steps toward leadership that cannot be assuaged with money as the deadlines and service time will not be able to be dialed back and the opportunities that are lost will expire. The time-sensitive nature of such situations justify preliminary injunctive relief and money damages would not suffice as a remedy. As an analogy, consider the suspension of the boxing license of a world fighting champion in his/her weight class. Plaintiff is at the top of his game and as time goes on and he is forced to sit idle, he could lose that imprimatur of a "Top Candidate" for many leadership positions the more time that goes on the less that timely prestige that opens doors and makes him an attractive candidate for leadership positions. Losing that opportunity because of

timing establishes irreparable harm that cannot be remedied by money damages. This would not be of import to this court if his absence were for the benefit of the general public and patient safety, but the opposite is the case here. Furthermore, his own harm established here clearly outweighs any harm Defendant would suffer while reinstating his privileges for this physician who has served the hospital for over 20 years.

Last but not least, the stress and psychosocial impact of extended delays worsen with time. Due to the prolonged absence and isolation, awkwardness and embarrassment, and mounting legal costs associated with handling the matter internally, many physicians capitulate and waived the fair hearing and due process while moving on because of the significant corrosive impact of the stress that worsened with delay.

***In fact, Defendants recently took action denying Plaintiff's renewal of his clinical privileges, essentially converting the "recommendation" into a material adverse action before the internal adjudication has even been scheduled and violating its own rules yet again.*** Defendants indicated in this letter that he will have to request a Fair Hearing for that decision as well, which carries with it separate procedural guidelines because it involves non-renewal of his clinical privileges. Per Defendant's guidelines and Bylaws, even if a panel in a Fair Hearing finds in Dr. Doe's favor on each of these matters, the decision may be

treated as advisory and the decision to prevent him from practicing may still be upheld. Based upon information and belief, this option has been exercised once by a physician in the past 10 years and Michigan Medicine has held one Fair Hearing in that time frame. Such a rare imposition of this process makes it unreliable as the sole avenue for the physician's remedy and being forced to await its conclusion while he sits idle and gets penalized would be inequitable, sustaining irreparable harm.

### D. Public Interest Would Be Served.

Public interest must be considered since Michigan Medicine one of just a handful of comprehensive craniofacial programs in the State of Michigan. While the impact on the general public is obvious and easily described, it cannot be overstated and must be considered in its decision for Plaintiff's return to practice.

The craniofacial program is losing patient's and losing prestige. The market is not saturated with experienced pediatric plastic surgeons. This may not be able to be rehabilitated after all the years it took to build one of the best craniofacial programs in the country. There has been a significant decrease in the numbers of patients and volume of craniofacial operations.

### E.  Case law supports injunctive relief in this matter.

Cases have been cited and attached, but it is important to note some of the details in some hospital related matters. In *Doe v. Community Medical Center*,

*supra*, (attached hereto as ***Exhibit G***), the Court held a hearing on March 18, 2008, to address both Dr. Doe's petition for a TRO and CMC's motion to dismiss. It heard witness testimony and admitted numerous exhibits. On March 25, 2008, the District Court granted Dr. Doe's application for a TRO. As a result of the TRO, CMC was prohibited from notifying the National Practitioner Data Bank and the Montana Board of Medical Examiners (MBME or the Board) of Dr. Doe's suspension as required by 42 U.S.C. § 11133(a)(1)(A) of the HCQIA, and § 37-3-403, MCA. Under the terms of the TRO, Dr. Doe agreed to refrain from practicing medicine at CMC or any other facility until the District Court conducted a preliminary injunction hearing and issued a further ruling. *Id*. at 383. Following a May 12, 2008 preliminary injunction hearing, the Court issued an order amending the TRO. In the amended order, Dr. Doe was authorized to practice medicine at other facilities but continued to be restrained from practicing at CMC. CMC moved for reconsideration of the amended TRO and the District Court denied the motion. On July 30, 2008, the District Court granted Dr. Doe's motion for a preliminary injunction and denied CMC's motion to dismiss Dr. Doe's complaint. *Id*. The Montana Supreme Court upheld this ruling, reasoning that summary judgment is an extreme remedy because it is a ruling on the merits of a case which terminates a complainant's district court proceedings with prejudice.  Upon the Court's ruling that Dr. Doe was entitled to a preliminary injunction.

See also *Meagher v. Butte-Silver Bow City-County*, 337 Mont. 339; 160 P.3d 552; 2007 MT 129 (2007) (attached hereto as ***Exhibit H***).

In *Knapik v. Mary Hitchcock Mem'l Hosp.*, 90 F. Supp. 3d 292 (D. Vt. 2015), (attached hereto as ***Exhibit I***), the Court held that physician whose privileges were summarily suspended was not required to complete hospital's peer review process before suing hospital for injunctive relief where physician alleged that hospital itself failed to follow process. ***This case is very similar to the present facts in Plaintiff's case.*** The overwhelming majority of courts, including the Court in this case, considered and respected the doctrine of exhaustion of remedies. Specifically, that internal administrative remedies should be exhausted before one pursues recourse to the courts. The Court reasoned that the principles which underlie the exhaustion rule apply to employment disputes involving doctors in the same way that they apply to other disputes subject to grievance procedures. *See Brooks v. Arlington Hosp. Ass'n,* 850 F.2d 191 (4th Cir.1988); *Soentgen v. Quain & Ramstad Clinic, P.C.,* 467 N.W. 2d 73 (N.D.1991); *Nemazee v. Mt. Sinai Med. Ctr.,* 56 Ohio St. 3d 109; 564 N.E. 2d 477 (1990); *Eidelson v. Archer,* 645 P.2d 171(Alaska 1982); *Garrow v. Elizabeth Gen. Hosp. & Dispensary,* 79 N.J. 549; 401 A.2d 533 (1979); *Westlake Cmty. Hosp. v. Superior Court,* 17 Cal.3d 465; 131 Cal.Rptr. 90; 551 P.2d 410 (1976); *but see Doe v. Cmty. Med. Ctr., Inc., supra*, (holding that physician whose

17

privileges were summarily suspended was not required to complete hospital's peer review process before suing hospital for injunctive relief where physician alleged that hospital itself failed to follow process). These cases recognize both the potential savings to the parties and the courts through compliance with the grievance mechanism as well as the value of developing a more complete administrative record. These are the same policies which have led to the frequent enforcement of the exhaustion doctrine in many other settings.

In *Knapik,* the plaintiff argued that exhaustion should not be required in her case because the defendant failed to follow its own policy. She points to the policy language stating that MHMH will inform a resident of its "recommendation" for dismissal in writing, at which point the resident has five days to request a hearing. According to her, the June 13, 2012 letter skipped the "recommendation" step, and dismissed her immediately. Plaintiff argues that any recourse to the grievance process would have been futile because the outcome was, in her view, predetermined. *Knapik*, 90 F. Supp. 3d at 298. The Court found this argument to be persuasive. Proof of futility affords an exception to the exhaustion doctrine. *See DeVere v. State,* 149 N.H. 674; 827 A.2d 997, 999 (2003). The plaintiff must show that the administrative tribunal lacked power to grant the relief sought, or that the process was so marked by delay or bias that enforcement of the internal process is unreasonable. *See Id.* The opinion states further that "The

problem here is not with the grievance process as written, but with the fact that MHMH failed to follow it." *Knapik*, 90 F. Supp. at 299. Specifically, the hospital informed general surgery faculty and residents that Dr. Knapik was no longer part of the program, a step that should have been delayed if there was any possibility of a different outcome. *Id.* By these actions, MHMH effectively foreclosed meaningful resort to the grievance process. *Id*. Even if Dr. Knapik had requested a hearing within the five-day period stated in the letter, it is highly unlikely that the hearing would have taken place before the Miami program rescinded its offer. *Id.* The damage to her career and reputation had taken place. The Court was satisfied that pursuing the administrative appeal process in Dr. Knapik's case would have been futile. *Id*.

*In this case,* Plaintiff has not even been provided with dates for a fair hearing. It is highly likely that his matter may not be concluded until 2023. This is unacceptable. Within months of the suspension and failure to adhere to its own policies, Michigan Medicine cut his pay, reported him to the NPDB, sought his dismissal, and predetermined the outcome.

In *Parks v. Ala. State Bd. Of Pharmacy (Ex Parte Ala. State Bd. Of Pharmacy)*, 253 So. 3d 972 (Ala. Civ. App. 2017), (attached hereto as **Exhibit J**), the Court declined to follow the preemption rationale in *Diaz v. Provena Hosps.*, 352 Ill.App.3d 1165, 1167; 288 Ill. Dec. 81; 817 N.E.2d (2 Dist. 2004), because

the parties failed to present a specific legal argument urging the Court to do so and because the Court had not been presented with evidence "of an express declaration in the HCQIA of its intent to preempt state law."

## <u>CONCLUSION</u>

Plaintiff remains an asset to Michigan Medicine and the patient population it serves. In this unique field of pediatric plastic surgery, he is among the leaders and trailblazers in in this practice. The physicians that work for Defendants are not unionized, they do not have any sophisticated contracts for employment, and have very few protections for security of their hard earned and coveted positions. In disregard of its own rules, Defendants have stripped away and degraded the only recourse mechanism for due process that the physicians have to dispute adverse action against them. It is because of this that Plaintiff had no choice but to seek recourse in the courts, where it respectfully requests an order for a full return to practice while the internal process runs its course in accordance with its written policies.

**WHEREFORE**, Plaintiff respectfully requests that the Court immediately enter a temporary restraining order and order to show cause why a preliminary injunction prohibiting Defendants and any agent of Defendants, including any person or entity in active concert or participation with Defendants or acting under

Defendant's direction and control who receive notice of the order, to order the following:

    a. Defendant shall be enjoined from reporting to the NPDB (or correcting/retracting any published report), State of Michigan Board of Medicine, or any other entity regarding Plaintiff's temporary but indefinite suspension from practice; and

    b. Defendant shall reinstate Plaintiff to practice immediately. Plaintiff shall be reinstated into full, unrestricted practice unless a formal investigation, replete with due process, concludes with a finding that his continued practice would constitute a threat to patient safety.

        Respectfully submitted,

        */s/ Saif R. Kasmikha*
        Saif R. Kasmikha (P74320)
Dated: December 29, 2021    Midwest Legal Partners, PLLC
        Attorney for Plaintiff
        42705 Grand River Avenue, Suite 201,
        Novi, MI 48375
        Office: (248) 344-4570
        E-mail: skasmikha@midwestlegalpartners.com

        Ronald G. Acho
        Cummings, McClorey, Davis & Acho, P.L.C.
        17436 College Parkway
        Livonia, MI  48152
        (734) 261-2400
        Attorney for Plaintiff
        Email: racho@cmda-law.com
        P-23913

## **LOCAL RULE CERTIFICATION**

LOCAL RULE CERTIFICATION:  I, SAIF R. KASMIKHA, certify that this document complies with Local Rule 5.1(a), including:  double-spaced (except for quoted materials and footnotes; at least one-inch margins on the top, sides, and bottom, consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14-point (for proportional fonts).  I also certify that it is the appropriate length.  Local Rule 7.1(d)(3).

*/s/ Saif R. Kasmikha*
Saif R. Kasmikha (P74320)